■ JOSE NUNEZ, an Infant, by His Mother and Natural Guardian, MARTHA NUNEZ, Respondent, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION (ELMHURST HOSPITAL CENTER), Appellant. [972 NYS2d 618]—

In an action to recover damages for medical malpractice, the defendant appeals from an order of the Supreme Court, Queens County (Hart, J.), dated July 29, 2011, which denied its motion, inter alia, pursuant to CPLR 4404 (a) to set aside a jury verdict in favor of the plaintiff and against it and for judgment as a matter of law or, in the alternative, to set aside the jury verdict on the ground that the defendant was deprived of a fair trial and for a new trial, or, in the alternative, to set aside the jury verdict as contrary to the weight of the evidence and for a new trial, or, in the alternative, to conditionally reduce the awards of

damages for past and future pain and suffering and economic damages on the ground that they deviate materially from what would be reasonable compensation.

Ordered that the order is modified, on the law and in the exercise of discretion, by deleting the provision thereof denying that branch of the defendant's motion which was pursuant to CPLR 4404 (a) to set aside the jury verdict on the ground that the defendant was deprived of a fair trial and for a new trial, and substituting therefor a provision granting that branch of the motion; as so modified, the order is affirmed, without costs or disbursements, and the matter is remitted to the Supreme Court, Queens County, for a new trial before a different Justice.

In this medical malpractice action, the infant plaintiff, by his mother and natural guardian, alleged that the defendant hospital failed to properly diagnose the mother's pre-term labor upon presentation on August 21, 1998, and delayed delivery despite an indication of fetal distress on August 25, 1998, thereby causing the infant to suffer from lack of oxygen, resulting in cerebral palsy and other related injuries. The defendant contends that the infant's injuries were caused by uteroplacental insufficiency (a failure of the placenta to carry sufficient oxygen and nutrients to the fetus), a condition which could not have been diagnosed prior to delivery.

The trial court committed several errors and engaged in conduct that served to deprive the defendant of a fair trial. At trial, the defendant presented the expert testimony of a pediatric neurologist, Walter Molofsky. Molofsky had not examined the infant and, therefore, based his opinions upon his review of the medical records. On cross-examination, the plaintiff's counsel challenged Molofsky's opinions based upon the fact that he had not examined the infant, and raised the fact that another pediatric neurologist, Joseph Maytal, had examined the infant on behalf of the defendant, but had not been called to testify. The defendant sought permission to call Maytal for the limited purpose of testifying as to his clinical findings upon examination. The court denied the defendant's request on the ground that Maytal's testimony would be cumulative to Molofsky's testimony.

"[W]hether evidence should be excluded as cumulative rests within the sound discretion of the trial court" (*Shafran v St. Vincent's Hosp. & Med. Ctr.*, 264 AD2d 553, 556 [1999] [internal quotation marks and citations omitted]). However, as the defendant contends, Maytal's testimony would not have been cumulative to the extent that it would have been limited to his clinical findings regarding his physical examination of the infant.

Molofsky chiefly testified regarding the issue of causation, i.e., whether the infant's injuries were caused by a hypoxic event during the delivery. He was precluded by the trial court from testifying concerning Maytal's examination report because it had not been entered into evidence. Thus, although there was potential for overlap between the testimony of Maytal and Molofsky, the trial court should have allowed Maytal's testimony, limiting the subject matter of his testimony to his clinical findings upon physical examination, as requested by the defendant, rather than precluding Maytal's testimony altogether (*see id.* at 557; *Rojas v Greyhound Lines*, 254 AD2d 188 [1998]; *Jellema v 66 W. 84th St. Owners Corp.*, 248 AD2d 117 [1998]). The court's ruling resulted in significant prejudice to the defendant, since it prevented the defendant from addressing the argument made by the plaintiff's counsel during summation that Maytal was not called to testify because his findings would not have been favorable to the defense.

The defendant was further deprived of a fair trial by the court's excessive intrusion into the examination of witnesses, and by the nature and extent of its questioning and comments (*see generally DeCrescenzo v Gonzalez*, 46 AD3d 607 [2007]). It is axiomatic that the trial court "has broad authority to control the courtroom, rule on the admission of evidence, elicit and clarify testimony, expedite the proceedings and to admonish counsel and witnesses when necessary" (*Messinger v Mount Sinai Med. Ctr.*, 15 AD3d 189, 189 [2005]). Nonetheless, a trial court must be "mindful that its participation in the questioning of witnesses has the potential to influence the jury and, thus, when it intervenes to clarify testimony or elicit a responsive answer, it must be careful to do so in an evenhanded and temperate manner" (*Rizzo v Kay*, 79 AD3d 1001, 1002 [2010]). Here, while the trial court had the authority to elicit and clarify the defense witnesses' testimony, the record shows that on repeated occasions, including those specifically discussed by our dissenting colleague, it did not do so in an evenhanded and temperate manner. The court conveyed an impression of incredulity with respect to the defense witnesses' opinions, as reflected by the record (*see Porcelli v Northern Westchester Hosp. Ctr.*, 110 AD3d 703 [2013] [decided herewith]; *Butler v New York City Hous. Auth.*, 26 AD3d 352 [2006]; *Gentile v Terrace Hgts. Hosp.*, 57 AD2d 585 [1977]). Moreover, the court's incredulity had an improper cumulative effect (*see Porcelli v Northern Westchester Hosp. Ctr.*, 110 AD3d 703 [2013] [decided herewith]).

The court further deprived the defendant of a fair trial by issuing a supplemental jury instruction pursuant to *Noseworthy v*

*City of New York* (298 NY 76 [1948]). The *Noseworthy* doctrine had no application to the facts of this case because the infant's inability to testify about the events surrounding his birth was not the result of memory loss stemming from the defendants' alleged negligence. Further, the defendant's knowledge as to the cause of the infant's injuries was no greater than the mother's (*see Knudsen v Mamaroneck Post No. 90, Dept. of N.Y.-Am. Legion, Inc.*, 94 AD3d 1058 [2012]; *Zalot v Zieba*, 81 AD3d 935 [2011]). The mother testified extensively about the circumstances surrounding her labor and delivery, and testified about the infant's injuries. Since the mother and the defendant are on an equal footing with respect to their access to knowledge of the events which caused the infant's injuries, the trial court erred in giving a supplemental jury instruction pursuant to *Noseworthy*, which relaxed the plaintiff's burden of proof (*see Martone v Shields*, 71 AD3d 840 [2010]).

Accordingly, the trial court's errors and conduct warrant a new trial, before a different Justice.

The defendant's remaining contentions are without merit or have been rendered academic in light of our determination. Dillon, J.P., Roman and Miller, JJ., concur.

Hinds-Radix, J., concurs in part and dissents in part and votes to modify the order by deleting the provisions thereof denying those branches of the defendant's motion which were to conditionally reduce the awards of damages for past pain and suffering, future pain and suffering, medical equipment and supplies, home health care or facility care starting at age 21, and loss of earnings, on the ground that they deviate materially from what would be reasonable compensation, and substituting therefor a provision granting those branches of the motion, and, as so modified, to affirm the order and to remit the matter to the Supreme Court, Queens County, for a new trial on those items of damages, unless within 30 days after service upon the plaintiff of a copy of this decision and order, the plaintiff shall file in the office of the Clerk of the Supreme Court, Queens County, a written stipulation consenting to reduce the amount of damages awarded for past pain and suffering from the principal sum of $1.5 million to the principal sum of $750,000, for future pain and suffering from the principal sum of $8.7 million to the principal sum of $1.5 million, and for medical equipment and supplies from the principal sum of $3,571.50 per year for 64 years, with a growth rate of 3.5%, to the principal sum of $1,217.03 per year for 64 years, with a growth rate of 2.5%, to reduce the growth rate for home health care or facility care starting at age 21 from 3.5% to 3%, and to reduce the

growth rate for damages for lost earnings from 3.5% to 3%, and, in the event that the plaintiffs so stipulate, to affirm the order, as so modified, and to remit the matter to the Supreme Court, Queens County, for an appropriate judgment, with the following memorandum:

In this medical malpractice action, the infant plaintiff, by his mother and natural guardian, alleged that the defendant hospital failed to properly diagnose the mother's pre-term labor when she went to the hospital's emergency room on August 21, 1998, and delayed delivery despite an indication of fetal distress on August 25, 1998, causing the infant to suffer from a lack of oxygen, resulting in cerebral palsy and other related injuries. The defendant contends that the infant's injuries were caused by uteroplacental insufficiency (a failure of the placenta to carry sufficient oxygen and nutrients to the fetus), a condition which could not have been diagnosed prior to delivery.

The verdict as to liability was supported by the weight of the credible evidence. "The jury's resolution of conflicting expert testimony is entitled to great weight, as it is the jury that had the opportunity to observe and hear the experts" (*Taylor v Haque*, 94 AD3d 978, 979 [2012]). However, the award of damages for past and future pain and suffering was excessive to the extent indicated (*see Morales v Interfaith Med. Ctr.*, 71 AD3d 648 [2010]; *Quezada v O'Reilly-Green*, 24 AD3d 744 [2005]). Further, based upon the testimony presented, the award for medical equipment and supplies was excessive. Moreover, the growth rate for medical equipment and supplies should be reduced from 3.5% to 2.5%, and the growth rates for home health care or facility care and lost earnings should be reduced from 3.5% to 3%, based upon the evidence adduced at the trial and the plaintiff's statements in his brief that he would not oppose those reductions.

In my view, the defendant is not entitled to a new trial based upon its claims of trial error. Many of the defendant's contentions with respect to trial error are either unpreserved for appellate review or without merit. The defendant's contention that it should have been permitted to impeach the credibility of the plaintiff's expert with the fact that his medical license was placed on probation in 1985 is without merit, as the misconduct was remote in time and did not necessarily involve moral turpitude (*see People v Pereda*, 200 AD2d 774 [1994]). The trial court's refusal to give a missing-witness instruction was proper, as the testimony of the missing witness would have been cumulative (*see Batchu v 5817 Food Corp.*, 56 AD3d 402, 403 [2008]).

The trial court would not permit the defendant to call Joseph Maytal, a pediatric neurologist, as a witness, because the defendant already called another pediatric neurologist, Walter Molofsky. The question of whether evidence should be excluded as cumulative rests within the sound discretion of the trial court (*see Shafran v St. Vincent's Hosp. & Med. Ctr.*, 264 AD2d 553, 556 [1999]). There is no indication in this record that the court's ruling that the defendant could not call as expert witnesses two experts with the same expertise was a surprise sprung on the defendant during the trial (*cf. Krinsky v Rachleff*, 276 AD2d 748 [2000]). Under the circumstances, it cannot be said that the court improvidently exercised its discretion, or that any error in this regard would warrant reversal in the context of this lengthy trial.

With respect to the infant's failure to testify at the trial, the trial court gave a *Noseworthy* instruction at the plaintiff's request (*see Noseworthy v City of New York*, 298 NY 76 [1948]). This was error, since the infant's inability to testify as to events surrounding his birth was not a result of the defendant's negligence, and his mother testified extensively about the events surrounding his birth and his alleged injuries. However, the court limited the effect of its own instruction, by stating that the "formal" effect of that instruction was that the jury was not to draw an adverse inference against the plaintiff based on the fact that the infant, age 11 at the time of trial, did not testify at the trial as to "how the alleged injuries affect his daily life." The court further noted that "[h]is mother testified in his stead and his mother, while she might not live [the plaintiff's] life, you can consider her recounting of what she sees." Therefore, the court alleviated any prejudice from its own error.

In this lengthy trial, the defendant points to several brief instances where one could infer that "the manner in which the trial court questioned witnesses was inappropriate" (*Rizzo v Kay*, 79 AD3d 1001, 1001 [2010]). However, since most of these instances occurred without objection or any discussion, the defendant's inferences are not always supportable by the record, and, as previously noted, the defendant's contentions regarding these instances are unpreserved for appellate review. In any event, "the court did not engage in the type of repeated prejudicial intrusions that have been found to prevent the jury from considering the evidence" (*id.*). Further, it is well settled that " '[t]he trial court has broad discretion in controlling the scope of direct, cross, and redirect questioning' " (*Georgescu v City of New York*, 107 AD3d 946, 946-947 [2013], quoting *Caserta v Levittown School Dist.*, 12 AD3d 549, 550 [2004]).

The defendant argues that the trial court, without objection, implied that the plaintiff's witness Douglas Levine was being evasive when the court questioned him about whether a yellowish discharge could be the sign of an infection. When Levine acknowledged that pus could have a yellowish tinge, the court responded "Tah-dah." However, Levine later testified that a yellow discharge was not a sign of early labor or any particular condition, thus clarifying his testimony. The court responded by asking whether the thrust of the testimony was that a yellow discharge could be present when there was an infection, but was not a "sign" of infection, and Levine replied "That's correct. Thank you for helping me clarify that." Thus, the effect of this interchange was not to imply evasion but to clarify testimony.

The trial court also intervened during the testimony of three defense witnesses, mostly without objection. The first of these defense witnesses, David Alan Schwartz, testifying with respect to liability issues, claimed that the infant's injuries were the result of placental insufficiency, which did not cause the infant to be born small for his gestational age of 31 weeks, because intrauterine growth restrictions would not be expected until 35 weeks. The court noted, without objection, that Schwartz testified that "you wouldn't expect to see it" and also testified that growth restrictions at 31 weeks was "unusual," and asked "which one is it?" Schwartz replied that it was possible to see a growth restriction at 31 weeks, but it was unusual, thus clarifying his testimony.

The plaintiff's counsel noted that Schwartz was a pathologist who examined slides, not babies, and asked "[s]o you don't know clinically what their condition is other than what you have seen on the slides." Schwartz replied, "I don't understand what you are referring to." The trial court then intervened, by rephrasing the plaintiff's counsel's question several different ways. When the court reiterated "You can't tell exactly from reading the slides what the injuries are. You can say what they might be or what they might have been or what might have caused these injuries. That's the question." Defense counsel objected. The court then asked Schwartz "Could you be just a tad more specific?" When Schwartz said "I would like to be," the court replied "Go for it." This interchange clarified the meaning of the plaintiff's counsel's question, and ultimately solicited more specific testimony on behalf of the defense.

The hospital's report of the birth indicated no problem with the placenta. Schwartz explained this discrepancy by noting that the placenta may not have been examined microscopically

at the time of the birth. Slides were taken of the placenta at the time of the birth and, apparently, the placenta was thereafter destroyed. Schwartz noted that the slides may have been taken and stored without being examined microscopically. When the trial court asked whether this was a typical or unusual practice, defense counsel asked "Judge, are you cross-examining the doctor?" and the court replied, "No, I'm asking a question and if I am, so what?" Thereafter, Schwartz reiterated his testimony that, because there was no indication in the pathology report prepared by the hospital at the time of the birth that the slides were examined microscopically, he did not believe that any such examination was performed. The court asked Schwartz several times how he knew there was no microscopic examination, and Schwartz replied that in his 25 years of teaching pathology, the standard was "if you performed a microscopic examination you noted it in your report." When the *plaintiff's counsel* tried to challenge that testimony by asking whether it was "possible" that there was a microscopic examination, but no description of the examination, the court replied "Counsel, he said what he said," and the witness was excused. Contrary to the defendant's contention, the court did not extend the cross-examination of Schwartz. Rather, the cross-examination was concluded, with Schwartz refuting the plaintiff's argument that there was a microscopic examination of the placenta at the time of the birth.

During the examination of the defense experts Jane Maddson and David Erlanger regarding the issue of damages, the trial court also intervened without objection. When Maddson stated that the plaintiff could go to college because he was attending an "inclusion class" in the fifth grade, the court advised Maddson that "an inclusion class can be a federal mandate. Just being in an inclusion class does not mean he can graduate and go to college. You have to be a little more specific," whereupon Maddson gave more specific testimony. When Maddson said that the plaintiff "had the right as an American" to the least restrictive environment, the court asked "what does that mean, 'he has the right as an American?' " When defense counsel asked Maddson what "WHO" was and she replied "the World Health Organization," the court asked "Why am I listening to the stuff about World Health Organization in the context of this case?" These interventions were proper exercises of the court's discretion to control the scope of questioning, and to insure that the scope of questioning did not deviate from relevant facts.

Thereafter, defense counsel objected, not to the trial court's questioning, but to "your tone of voice to the witness," which

cannot be reflected in a printed record. The court replied that it could speak loudly, since "[m]y name is on the front of the courtroom," which did not indicate prejudice to either side.

At another point during Maddson's testimony, but not during an interchange between the witness and the trial court, the court noted that "Among everybody in here only two people in this courtroom can have an attitude, me and Sheryl." Then Maddson asked "Can I finish my answer?" and the court replied "Please." Since there was no objection, it is impossible to know who or what the court was referring to during this interchange, or how this interchange may have prejudiced the defendant.

During the testimony of David Erlanger, who testified that the plaintiff's academic skills were average, the trial court asked, without objection, whether Erlanger was expanding the definition of average, because he was including intelligence quotients of 80 and 119 in the definition of average. Erlanger replied that the average had to "be within the middle 68 percent of the bell curve." The court then asked, "statistically, why was 68 per cent chosen to be the median?" Ehrlanger replied "It's a plus and minus two-thirds of a standard deviation," thus providing a coherent basis for his opinion.

Thereafter, when Erlanger testified that the plaintiff's speed naming was borderline at the level of the bottom 2% of the population, the trial court asked, "What is borderline about that?" Defense counsel objected, stating "I don't object to your question but I do object to your tone," which, as previously noted, cannot be reflected in a printed record. Erlanger then explained that 1% was considered impaired and 2% was considered borderline, thus providing a coherent basis for his opinion.

Thereafter, Erlanger testified that the plaintiff's mathematics skills were on the low end of average. The trial court stated that getting a Regents diploma was difficult, since "you have to take calculus and all sorts of stuff like that to get a regent's diploma in math." Although this interchange was unfortunate, it was not relevant to the issues in the case, and did not indicate that the defendant's case was somehow deficient (*cf. Doe v Department of Educ. of City of N.Y.*, 54 AD3d 352, 354 [2008]).

The defendant's remaining claims of error are unpreserved for appellate review, without merit, or harmless in the context of this lengthy trial. It is well settled that a defendant is entitled to a fair trial, not a perfect trial (*see Chianese v Meier*, 285 AD2d 315, 320 [2001]).